Opinion for the court filed by Circuit Judge LOURIE. Opinion concurring in part filed by Circuit Judge MOORE.
Opinion concurring in part and dissenting in part filed by Circuit Judge BRYSON.
LOURIE, Circuit Judge.
Myriad Genetics, Inc. and the Directors of the University of Utah Research Foundation (collectively, “Myriad”) appeal from the decision of the United States District Court for the Southern District of New York holding that an assortment of medical organizations, researchers, genetic counselors, and patients (collectively, “Plaintiffs”) have standing under the Declaratory Judgment Act to challenge Myriad’s patents. Assoc. for Molecular Pathology v. U.S. Patent & Trademark Office, 669 F.Supp.2d 365 (S.D.N.Y.2009) (“DJ Op.”). Myriad also appeals from the district court’s decision granting summary judgment that all of the challenged claims are drawn to non-patentable subject matter under 35 U.S.C. § 101. Assoc. for Molecular Pathology v. U.S. Patent & Trademark Office, 702 F.Supp.2d 181 (S.D.N.Y.2010) (“SJ Op.”). We affirm in part and reverse in part.
On the threshold issue of jurisdiction, we affirm the district court’s decision to exer *1334 cise declaratory judgment jurisdiction because we conclude that at least one plaintiff, Dr. Harry Ostrer, has standing to challenge the validity of Myriad’s patents. On the merits, we reverse the district court’s decision that Myriad’s composition claims to “isolated” DNA molecules cover patent-ineligible products of nature under § 101 since the molecules as claimed do not exist in nature. We also reverse the district court’s decision that Myriad’s method claim to screening potential cancer therapeutics via changes in cell growth rates is directed to a patent-ineligible scientific principle. We, however, affirm the court’s decision that Myriad’s method claims directed to “comparing” or “analyzing” DNA sequences are patent ineligible; such claims include no transformative steps and cover only patent-ineligible abstract, mental steps.
Background
Plaintiffs brought suit against Myriad, challenging the patentability of certain composition and method claims relating to human genetics. See DJ Op., at 369-76. Specifically, Plaintiffs sought a declaration that fifteen claims from seven patents assigned to Myriad are drawn to patent-ineligible subject matter under 35 U.S.C. § 101: claims 1, 2, 5, 6, 7, and 20 of U.S. Patent 5,747,282 (“the '282 patent”); claims 1, 6, and 7 of U.S. Patent 5,837,492 (“the '492 patent”); claim 1 of U.S. Patent 5,693,473 (“the '473 patent”); claim 1 of U.S. Patent 5,709,999 (“the '999 patent”); claim 1 of U.S. Patent 5,710,001 (“the '001 patent”); claim 1 of U.S. Patent 5,753,441 (“the '441 patent”); and claims 1 and 2 of U.S. Patent 6,033,857 (“the '857 patent”).
The challenged composition claims cover two “isolated” human genes, BRCAl and BRCA2 (collectively, “BRCAl/2 ” or “BRCA ”), and certain alterations, or mutations, in these genes associated with a predisposition to breast and ovarian cancers. Representative composition claims include claims 1, 2, and 5 of the '282 patent:
1. An isolated DNA coding for a BRCAl polypeptide, said polypeptide having the amino acid sequence set forth in SEQ ID NO: 2.
2. The isolated DNA of claim 1, wherein said DNA has the nucleotide sequence set forth in SEQ ID NO: 1.
5. An isolated DNA having at least 15 nucleotides of the DNA of claim 1.
SEQ ID NO: 2 depicts the amino acid sequence of the BRCAl protein, and SEQ ID NO: 1 depicts the nucleotide sequence of the BRCAl DNA coding region. '282 patent col.19 11.48-50.
All but one of the challenged method claims cover methods of “analyzing” or “comparing” a patient’s BRCA sequence with the normal, or wild-type, sequence to identify the presence of cancer-predisposing mutations. Representative method claims include claim 1 of the '999 and '001 patents:
1. A method for detecting a germline alteration in a BRCAl gene, said alteration selected from the group consisting of the alterations set forth in Tables 12A, 14, 18 or 19 in a human which comprises analyzing a sequence of a BRCAl gene or BRCAl RNA from a human sample or analyzing a sequence of BRCAl cDNA made from mRNA from said human sample with the proviso that said germline alteration is not a deletion of 4 nucleotides corresponding to base numbers 4184-4187 of SEQ ID NO: 1.
'999 patent claim 1 (emphases added).
1. A method for screening a tumor sample from a human subject for a somatic alteration in a BRCAl gene in said tumor which comprises [ ] comparing a first sequence selected from the group consisting of a BRCAl gene from said tumor sample, BRCAl RNA from *1335 said tumor sample and BRCA1 cDNA made from mRNA from said tumor sample with a second sequence selected from the group consisting of BRCA1 gene from a nontumor sample of said subject, BRCA1 RNA from said nontumor sample and BRCA1 cDNA made from mRNA from said nontumor sample, wherein a difference in the sequence of the BRCA1 gene, BRCA1 RNA or BRCA1 cDNA from said tumor sample from the sequence of the BRCA1 gene, BRCA1 RNA or BRCA1 cDNA from said nontumor sample indicates a somatic alteration in the BRCA1 gene in said tumor sample.
'001 patent claim 1 (emphasis added).
The final method claim challenged by Plaintiffs is directed to a method of screening potential cancer therapeutics. Specifically, claim 20 of the '282 patent reads as follows:
20. A method for screening potential cancer therapeutics which comprises: growing a transformed eukaryotic host cell containing an altered BRCA1 gene causing cancer in the presence of a compound suspected of being a cancer therapeutic, growing said transformed eukaryotic host cell in the absence of said compound, determining the rate of growth of said host cell in the presence of said compound and the rate of growth of said host cell in the absence of said compound and comparing the growth rate of said host cells, wherein a slower rate of growth of said host cell in the presence of said compound is indicative of a cancer therapeutic.
The challenged claims thus relate to isolated gene sequences and diagnostic methods of identifying mutations in these sequences. To place this suit in context, we take a step back to provide background on the science involved, including the identification of the BRCA genes, and the Plaintiffs’ connections to the invention and to Myriad.
I.
Human genetics is the study of heredity in human beings.[1] The human genome, the entirety of human genetic information, contains approximately 25,000 genes, which form the basis of human inheritance. The majority of genes act by specifying polypeptide chains that form proteins. Proteins in turn make up living matter and catalyze all cellular processes.
Chemically, the human genome is composed of deoxyribonucleic acid (“DNA”). Each DNA molecule is made up of repeating units of four nucleotide bases — adenine (“A”), thymine (“T”), cytosine (“C”), and guanine (“G”) — which are covalently linked, or bonded,[2] together via a sugar-phosphate, or phosphodiester, backbone. DNA generally exists as two DNA strands intertwined as a double helix in which each base on a strand pairs, or hybridizes, with a complementary base on the other strand: A pairs with T, and C with G. Figure 1 below depicts the structure of a DNA double helix and the complementary pairing of the four nucleotide bases, represented by A, T, C, and G.
*1336 [[Image here]]
The linear order of nucleotide bases in a DNA molecule is referred to as its “sequence.” The sequence of a gene is thus denoted by a linear sequence of As, Ts, Gs, and Cs. “DNA sequencing” or “gene sequencing” refers to the process by which the precise linear order of nucleotides in a DNA segment or gene is determined. A gene’s nucleotide sequence in turn encodes for a linear sequence of amino acids that comprise the protein encoded by the gene, e.g., the BRCAl gene encodes for the BRCA1 protein. Most genes have both “exon” and “intron” sequences. Exons are DNA segments that are necessary for the creation of a protein, ie., that code for a protein. Introns are segments of DNA interspersed between the exons that, unlike exons, do not code for a protein.
The creation of a protein from a gene comprises two steps: transcription and translation. First, the gene sequence is “transcribed” into a different nucleic acid called ribonucleic acid (“RNA”). RNA has a chemically different sugar-phosphate backbone than DNA, and it utilizes the nucleotide base uracil (“U”) in place of thymine (“T”). For transcription, the DNA double helix is unwound and each nucleotide on the non-coding, or template, DNA strand is used to make a complementary RNA molecule of the coding DNA strand, ie., adenine on the template DNA strand results in uracil in the RNA molecule, thymine results in adenine, guanine in cytosine, and cytosine in guanine. The resulting “pre-RNA,” like the DNA from which it was generated, contains both exon and intron sequences. Next, the introns are physically excised from the pre-RNA molecule, in a process called “splicing,” to produce a messenger RNA (“mRNA”). Figure 2 below shows the steps of transcribing a gene that contains three exons (exon 1-3) and two introns (intron 1 and 2) into a pre-RNA, followed by RNA splicing of the introns to produce an mRNA containing just the exon sequences.
*1337 [[Image here]]
Following transcription, the resulting mRNA is “translated” into the encoded protein. Genes, and their corresponding mRNAs, encode proteins via three-nucleotide combinations called codons. Each co-don corresponds to one of the twenty amino acids that make up all proteins or a “stop” signal that terminates protein translation. For example, the codon adenine-thymine-guanine (ATG, or UTG in the corresponding mRNA), encodes the amino acid methionine. The relationship between the sixty-four possible codon sequences and their corresponding amino acids is known as the genetic code. Figure 3 below represents an mRNA molecule that translates into a protein of six amino acids (Codon 1, AUG, methionine; Codon 2, ACG, threonine; Codon 3, GAG, glutamic acid; Codon 4, CUU, leucine; Codon 5, CGG, arginine; Codon 6, AGC, serine), and ends with one of the three stop co-dons, UAG.
[[Image here]]
*1338 Changes, or mutations, in the sequence of a human gene can alter the structure as well as the function of the resulting protein. Small-scale changes include point mutations in which a change to a single nucleotide alters a single amino acid in the encoded protein. For example, a base change in the codon G CU to C GU changes an alanine in the encoded protein to an arginine. Larger scale variations include the deletion, rearrangement, or duplication of larger DNA segments, ranging from several hundreds to over a million nucleotides, and result in the elimination, misplacement, or duplication of an entire gene or genes. While some mutations have little or no effect on the body’s processes, others result in disease, or an increased risk of developing a particular disease. DNA sequencing is used in clinical diagnostic testing to determine whether a gene contains mutations associated with a particular disease or risk of a particular disease.
Nearly every cell in the human body contains an individual’s entire genome. DNA in the cell, called “native” or “genomic” DNA, is packaged into twenty-three pairs of chromosomes. Chromosomes are complex structures of a single DNA molecule wrapped around proteins called histones, as shown in Figure 4 below.
[[Image here]]
Humans have twenty-two pairs of autosomal chromosomes, numbered one to twenty-two according to size from largest to smallest, and one pair of sex chromosomes, two X chromosomes in females and one X and one Y chromosome in males.
Genomic DNA can be extracted from its cellular environment using a number of well-established laboratory techniques. A particular segment of DNA, such as a gene, can then be excised or amplified from the DNA to obtain the isolated DNA segment of interest. DNA molecules can *1339 also be synthesized in the laboratory. One type of synthetic DNA molecule is complementary DNA (“cDNA”). cDNA is synthesized from mRNA using complementary base pairing in a manner analogous to RNA transcription. The process results in a double-stranded DNA molecule with a sequence corresponding to the sequence of an mRNA produced by the body. Because it is synthesized from mRNA, cDNA contains only the exon sequences, and thus none of the intron sequences, from a native gene sequence.
II.
Mutations in the BRCA genes correlate with an increased risk of breast and ovarian cancer. The average woman in the United States has around a twelve to thirteen percent risk of developing breast cancer in her lifetime. Women with BRCA mutations, in contrast, face a cumulative risk of between fifty to eighty percent of developing breast cancer and a cumulative risk of ovarian cancer of between twenty to fifty percent. Diagnostic genetic testing for the existence of BRCA mutations is therefore an important consideration in the provision of clinical care for breast or ovarian cancer. This testing provides a patient with information on her risk for hereditary breast and ovarian cancers, and thus aids in the difficult decision regarding whether to undertake preventive options, including prophylactic surgery. Diagnostic results can also be an important factor in structuring an appropriate course of cancer treatment, since certain forms of chemotherapy are more effective in treating cancers related to BRCA mutations.
The inventors of the patents in suit identified the genetic basis of BRCAl and BRCA2-related cancers using an analysis called positional cloning. Relying on a large set of DNA samples from families with inherited breast and ovarian cancers, the inventors correlated the occurrence of cancer in individual family members with the inheritance' of certain marker DNA sequences. This allowed the inventors to identify, or “map,” the physical location of the BRCA genes within the human genome and to isolate the BRCA genes and determine their exact nucleotide sequences. This in turn allowed Myriad to provide BRCA diagnostic testing services to women.
Myriad filed the first patent application leading to the patents in suit covering isolated BRCAl DNA and associated diagnostic methods in August 1994. The first patent, the '473 patent, issued on December 2, 1997. Myriad filed the first application leading to the patents in suit covering isolated BRCA2 DNA and associated diagnostic methods in December 1995, and the first patent, the '492 patent, issued on November 17,1998.
III.
Myriad, however, was not the only entity to implement clinical BRCA testing services. Starting in 1996, the University of Pennsylvania’s Genetic Diagnostic Laboratory (“GDL”), co-directed by plaintiffs Haig H. Kazazian, Jr., M.D. and Arupa Ganguly, Ph.D., provided BRCAl/2 diagnostic services to women. By 1999, however, accusations by Myriad that GDL’s BRCA testing services infringed its patents forced the lab to stop providing such services.
The first sign of a dispute came in early 1998. At that time, Dr. Kazazian recalls a dinner with Dr. Mark Skolnick, inventor and Chief Science Office at Myriad. At the dinner, Skolnick informed Kazazian that Myriad was planning to stop GDL from providing clinical BRCA testing in light of Myriad’s patents. A month or two later, in May 1998, Kazazian received a letter from William A. Hockett, Director of Corporate Communications at Myriad. The letter stated that Myriad *1340 knew that Kazazian was currently providing BRCAl diagnostic testing services, and that Myriad, as patent holder of five U.S. patents covering the isolated BRCAl gene and diagnostic testing, was making available to select institutions a collaborative license. Attached to the letter was a copy of Myriad’s collaborative agreement, which proposed severely limiting GDL’s testing services to certain tests for patients of Ashkenazi Jewish descent. Plaintiff Harry Ostrer, M.D., a researcher at New York University (“NYU”) School of Medicine, received the same letter and collaborative agreement in May 1998, although his laboratory did not, at the time, provide such testing services. Rather, Ostrer sent patient samples to GDL for BRCA genetic testing.
Months later, in August 1998, Dr. Kazazian received a second letter, this time from George A. Riley of the law firm O’Melveny & Myers LLP. The letter identified by number five Myriad patents “covering, among other things, the BRCAl gene sequence ... and methods for detecting alternations in the BRCAl sequence.” J.A. 1145. The letter also indicated that it “has come to Myriad’s attention that you are engaged in commercial testing activities that infringe Myriad’s patents,” and that “[u]nless and until a licensing arrangement is completed ... you should cease all infringing testing activity.” Id. The letter noted, however, that the cease- and-desist notification did not apply to research testing “for the purpose of furthering non-commercial research programs, the results of which are not provided to the patient and for which no money is received from the patient or the patient’s insurance.” Id.
In June 1999, Robert Terrell, the General Counsel for University of Pennsylvania, received a similar cease-and-desist letter from Christopher Wight, Myriad’s General Counsel. The letter stated, “It has come to our attention that Dr. Haig H. Kazazian, Jr. of the University of Pennsylvania is continuing to willfully engage in commercial BRCAl and BRCA2 genetic testing activities, in violation of the University of Pennsylvania’s previous assurances that such commercial testing activities would be discontinued.” J.A. 2890. Terrell responded to Wight by letter on September 10, 1999, stating that “the University agrees that it will not accept samples for BRCAl research testing from third parties.” J.A. 2891. Kazazian thus informed Dr. Ostrer that GDL would no longer be accepting patient samples for BRCA testing from him or anyone else as a result of the patent infringement assertions made by Myriad. As a result, Ostrer started sending patient samples for BRCA genetic testing to Myriad, who became (and remains today) the only provider of such services in the United States.
During this period, Myriad also initiated several patent infringement suits against entities providing clinical BRCA testing. Myriad filed suit against Oncormed Inc. in 1997 and again in 1998, Myriad Genetics v. Oncormed, Nos. 2:97-cv-922, 2:98-cv-35 (D.Utah), and the University of Pennsylvania in 1998, Myriad Genetics v. Univ. of Pa., No. 2:98-cv-829 (D.Utah). Both lawsuits were later dismissed without prejudice after each defendant agreed to discontinue all allegedly infringing activity.
None of the plaintiffs besides Drs. Kazazian, Ganguly, and Ostrer, allege that Myriad directed any letters or other communications regarding its patents at them. Rather, the other researchers and medical organization members state simply that knowledge of Myriad’s vigorous enforcement of its patent rights against others stopped them from engaging in clinical BRCA genetic testing, although they have the personnel, expertise, and facilities as well as the desire to provide such testing. *1341 The patient plaintiffs state that they have been unable to obtain any BRCA genetic testing or their desired BRCA testing, either through their insurance or at a price that they can afford, because of Myriad’s patent protection.
Like the other researchers, Dr. Kazazian states that if Myriad’s patents were held invalid, he and Dr. Ganguly would be able to resume BRCA testing within a matter of a few weeks. He notes, however, that this is only if they “decided to resume BRCA testing.” J.A. 2852. Ganguly concurs, stating that if the patents were invalidated, “I would immediately consider resuming BRCA testing in my laboratory.” J.A. 2892. Ostrer also indicates that his lab has all the personnel, facilities, and expertise necessary to undertake clinical BRCA testing and emphatically states that his lab “would immediately begin to perform BRCAl/2-related genetic testing upon invalidation of the Myriad patents.” J.A. 2936-38.
rv.
After Plaintiffs filed suit, Myriad moved to have the case dismissed, alleging that the Plaintiffs lacked standing to bring a declaratory judgment suit challenging the validity of its patents. The district court disagreed, however, holding that the Plaintiffs had established Article III standing under the “all the circumstances” test articulated by the Supreme Court in MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007). DJ Op., at 385-92. The court first found that Myriad had engaged in sufficient “affirmative acts” based on the company’s assertion of its “right to preclude others from engaging in BRCAl 12 genetic testing through personal communications, cease-and-desist letters, licensing offers, and litigation,” the result of which was “the widespread understanding that one may engage in BRCAl/2 testing at the risk of being sued for infringement liability by Myriad.” Id. at 390. Myriad’s actions, the court concluded, had placed “the Plaintiffs in precisely the situation that the Declaratory Judgment Act was designed to address: the Plaintiffs have the ability and desire to engage in BRCAl/2 testing as well as the belief that such testing is within their rights, but cannot do so without risking infringement liability.” Id.
In so holding, the court rejected Myriad’s argument that there must be some act directed toward the Plaintiffs, noting that Myriad had, in fact, taken affirmative acts toward plaintiffs Dr. Kazazian and Dr. Ganguly. Id. at 387-88. The court also rejected Myriad’s arguments that the cease-and-desist letter sent to plaintiff Kazazian was too old to support declaratory judgment jurisdiction and that the legal actions brought against third parties could not be considered in the jurisdictional analysis. Id. at 388-89. The court concluded that rigid adherence to either of these requirements would be inconsistent with Medlmmune’s mandate that the court assess the facts alleged under all the circumstances. Id.
The district court also found that the Plaintiffs had alleged sufficient meaningful preparations for infringement to establish declaratory judgment jurisdiction. Id. at 390-92. With respect to the researchers, the court held it was sufficient that they were all “ready, willing, and able” to begin BRCAl/2 testing within the normal course of their laboratories’ research, rejecting Myriad’s argument that they needed to allege specific preparatory activities. Id. at 390-91. The court also rejected Myriad’s argument that plaintiffs Kazazian and Ganguly testified only that they would “consider” engaging in allegedly infringing activities, concluding that the proper focus of the inquiry is whether they are meaningfully prepared, not whether they have *1342 made a final, conclusive decision to engage in such activities. Id. at 391 n. 18.
The parties then moved for summary judgment on the merits of Plaintiffs’ § 101 challenge to Myriad’s patent claims. The district court held for Plaintiffs, concluding that the fifteen challenged claims were drawn to non-patentable subject matter and thus invalid under § 101. SJ Op., at 220-37. Regarding the composition claims, the court held that isolated DNA molecules fall within the judicially created “products of nature” exception to § 101 because such isolated DNAs are not “markedly different” from native DNAs. Id. at 222, 232 (quoting Diamond v. Chakrabarty, 447 U.S. 303, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980)). The court relied on the fact that, unlike other biological molecules, DNAs are the “physical embodiment of information,” and that this information is not only preserved in the claimed isolated DNA molecules, but also essential to their utility as molecular tools. Id. at 228-32.
Turning to the method claims, the court held them patent ineligible under this court’s then definitive machine-or-transformation test. Id. at 233 (citing In re Bilski, 545 F.3d 943 (Fed.Cir.2008), affirmed on other grounds by Bilski v. Kappos, — U.S. —, 130 S.Ct. 3218, 3225, 177 L.Ed.2d 792 (2010)). The court held that the claims covered “analyzing” or “comparing” DNA sequences by any method, and thus covered mental processes independent of any physical transformations. Id. at 233-35. In so holding, the court distinguished Myriad’s claims from those at issue in Prometheus based on the “determining” step in the latter being construed to include the extraction and measurement of metabolite levels from a patient sample. SJ Op., at 234-35 (citing Prometheus Labs., Inc. v. Mayo Collaborative Servs., 628 F.3d 1347, 1350 (Fed.Cir.2010), cert. granted 2011 WL 973139 (June 20, 2011)). Alternatively, the court continued, even if the claims could be read to include the transformations associated with isolating and sequencing human DNA, these transformations would constitute no more than preparatory data-gathering steps. Id. at 236 (citing In re Grams, 888 F.2d 835, 840 (Fed.Cir.1989)). Finally, the court held that the one method claim to “comparing” the growth rate of cells claimed a basic scientific principle and that the transformative steps amounted to only preparatory data gathering. Id. at 237.
Myriad appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).
Discussion
I. Declaratory Judgment Jurisdiction
A.
The first question we must address is whether the district court correctly exercised declaratory judgment jurisdiction over this suit. The Declaratory Judgment Act provides that, “In a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.” 28 U.S.C. § 2201(a). The phrase “a case of actual controversy” in the Act refers to the types of “cases” and “controversies” that are justiciable under Article III of the U.S. Constitution. Aetna Life Ins. v. Haworth, 300 U.S. 227, 239-40, 57 S.Ct. 461, 81 L.Ed. 617 (1937).
Although no bright-line rule exists for determining whether a declaratory judgment action satisfies Article Ill’s ease- or-controversy requirement, the Supreme Court has held that the dispute must be “definite and concrete, touching the legal relations of parties having adverse legal interests,” “real and substantial,” and “admi[t] of specific relief through a decree *1343 of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.” MedImmune, 549 U.S. at 127, 127 S.Ct. 764 (quoting Aetna Life, 300 U.S. at 240-41, 57 S.Ct. 461). “Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.” Id. (quoting Md. Cas. Co. v. P. Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)).
In applying Medlmmune’s all-the-circumstances test to a declaratory judgment action, we are guided by the Supreme Court’s three-part framework for determining whether an action presents a justiciable Article III controversy: standing, ripeness, and mootness. See Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc., 527 F.3d 1278, 1291 (Fed.Cir.2008). In this case, the parties have framed the jurisdictional issue as one of standing. See MedImmune, 549 U.S. at 128 n. 8, 127 S.Ct. 764. (“The justiciability problem that arises, when the party seeking declaratory relief is himself preventing the complained-of injury from occurring, can be described in terms of standing ... or ... ripeness.” (internal citations omitted)).
“[T] he irreducible constitutional minimum of standing contains three elements.” Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). “First, the plaintiff must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.” Id. (internal citations and quotations omitted). “Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be ‘fairly ... traee[able] to the challenged action of the defendant. ...’” Id. (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41-42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). “Third, it must be ‘likely,’ as opposed to merely ‘speculative,’ that the injury will be ‘redressed by a favorable decision.’ ” Id. at 561, 112 S.Ct. 2130 (quoting Simon, 426 U.S. at 38, 43, 96 S.Ct. 1917).
“Whether an actual case or controversy exists so that a district court may entertain an action for a declaratory judgment of non-infringement and/or invalidity is governed by Federal Circuit law.” MedImmune, Inc. v. Centocor, Inc., 409 F.3d 1376, 1378 (Fed.Cir.2005), overruled on other grounds, MedImmune, 549 U.S. at 130-31, 127 S.Ct. 764. Following Medlmmune, this court has held that, to establish an injury in fact traceable to the patentee, a declaratory judgment plaintiff must allege both (1) an affirmative act by the patentee related to the enforcement of his patent rights, SanDisk Corp. v. STMicroelecs., Inc., 480 F.3d 1372, 1380-81 (Fed.Cir.2007), and (2) meaningful preparation to conduct potentially infringing activity, Cat Tech LLC v. TubeMaster, Inc., 528 F.3d 871, 880 (Fed.Cir.2008). We review the exercise of declaratory judgment jurisdiction upon a particular set of facts de novo. SanDisk Corp., 480 F.3d at 1377.
B.
Myriad challenges the district court’s jurisdictional decision on the grounds that Myriad and the Plaintiffs do not have adverse legal interests and that Plaintiffs have failed to allege a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. Specifically, Myriad argues that Plaintiffs have failed to allege any “affirmative acts” by Myriad within the past ten years relating to the patents in suit or directed at any Plaintiff. According to *1344 Myriad, the district court erred by relying on “stale communications” directed at Drs. Kazazian, Ganguly, and Ostrer over a decade ago, as well as ten-year-old licensing and litigation activities directed at third parties, and thus exercised jurisdiction based solely on Plaintiffs’ subjective fear of suit, arising from rumor and innuendo in the research community.
Plaintiffs respond that they have standing under Medlmmune’s all-the-cireumstances test because, not only are they undisputedly prepared to immediately undertake potentially infringing activities, but also Myriad took sufficient affirmative acts with respect to the patents in suit. Regarding the latter, Plaintiffs assert that Myriad sued, threatened to sue, or demanded license agreements from every known institution offering BRCA clinical testing, including university labs directed by plaintiffs Kazazian, Ganguly, and Ostrer, forcing each to cease such testing. And, according to Plaintiffs, the awareness of Myriad’s vigorous assertion of its patent rights still continues to suppress their ability to perform clinical BRCA testing, placing Plaintiffs in the very dilemma the Declaratory Judgment Act was intended to address: they must either proceed with BRCA-related activities and risk liability for patent infringement, or refrain from such activities despite believing Myriad’s patents are invalid.
Under the facts alleged in this case, we conclude that one Plaintiff, Dr. Ostrer, has established standing to maintain this declaratory judgment suit. All Plaintiffs claim standing under the Declaratory Judgment Act based on the same alleged injury: that they cannot undertake the NRCA-related activities that they desire because of Myriad’s enforcement of its patent rights covering BRCAl/%[3] Only three plaintiffs, however, allege an injury traceable to Myriad; only Drs. Kazazian, Ganguly, and Ostrer allege affirmative patent enforcement actions directed at them by Myriad. Of these three, Dr. Ostrer clearly alleges a sufficiently real and imminent injury because he alleges an intention to actually and immediately engage in allegedly infringing BRCA-rel&ted activities. We address each in turn.
Although Medlmmune relaxed this court’s more restrictive “reasonable apprehension of suit” test for declaratory judgment jurisdiction, SanDisk, 480 F.3d at 1380, it did not alter “the bedrock rule that a case or controversy must be based on a real and immediate injury or threat of future injury that is caused by the defendants,” Prasco, LLC v. Medicis Pharm. Corp., 537 F.3d 1329, 1339 (Fed.Cir.2008). Accordingly, following Medlmmune, this court has continued to hold that declaratory judgment jurisdiction will not arise merely on the basis that a party learns of the existence of an adversely held patent, or even perceives that such a patent poses a risk of infringement, in the absence of some affirmative act by the patentee. SanDisk, 480 F.3d at 1380-81. Thus, without defining the outer boundaries of declaratory judgment jurisdiction, we have held that “where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license, an Article III case *1345 or controversy will arise....” Id. at 1381; see also Prasco, 537 F.3d at 1338 (“A patentee can cause ... an injury [sufficient to create an actual controversy] in a variety of ways, for example, by creating a reasonable apprehension of an infringement suit, [or] demanding the right to royalty payments.” (internal citations omitted)).
In this case, Myriad demanded a royalty under its patents from Dr. Ostrer based on his clinical BRCA-related activities. In May 1998, Myriad’s Director of Corporate Communications sent Ostrer a letter proposing a collaborative license. The letter stated that Myriad was aware that Ostrer was either currently providing, or was interested in initiating, BRCAl diagnostic testing services and that Myriad, as holder of U.S. patents covering the BRCAl gene and diagnostic testing of BRCAl, was making available to his institution, NYU Medical Center, a limited collaborative license. The collaborative license required NYU to make a payment to Myriad for each non-research BRCA test performed.
At the same time, as Ostrer was aware, Myriad was asserting its patent rights against other similarly situated parties, a fact to be considered in assessing the existence of an actual controversy under the totality of circumstances. See Micron Tech., Inc. v. Mosaid Techs., Inc., 518 F.3d 897, 901 (Fed.Cir.2008). Soon after Ostrer received Myriad’s letter, Dr. Kazazian informed him that, because of Myriad’s assertion of its patent rights against him, GDL would no longer be accepting patient samples for BRCA genetic testing. Myriad’s assertion of its patent rights against Kazazian escalated into a patent infringement suit by Myriad against the University of Pennsylvania, which was later dismissed without prejudice after the University agreed to cease all accused BRCA testing services. Myriad also sued Oncormed for patent infringement based on its BRCA genetic testing services. As a result of Myriad’s patent enforcement actions, Dr. Ostrer was forced to send all patient samples to Myriad, now the sole provider of BRCA diagnostic testing services.
Dr. Ostrer, on the other hand, maintains that he could have proceeded with his BRCA-related clinical activities without taking a license from Myriad. This assertion is based on his belief that the patents Myriad claims cover such activities are invalid because genes are patent-ineligible products of nature. Acting on his belief, Ostrer seeks in this lawsuit a declaration of his right to undertake NfiCA-related clinical activities without a license. Accordingly, Myriad and Dr. Ostrer have taken adverse legal positions regarding whether or not Ostrer can engage in BRCA genetic testing without infringing any valid claim to “isolated” BRCA DNAs or methods of “analyzing” or “comparing” BRCA sequences, as recited in Myriad’s patents. See Aetna Life, 300 U.S. at 242, 57 S.Ct. 461 (holding declaratory judgment jurisdiction existed when “the parties had taken adverse positions with respect to their existing obligations” on an insurance contract).
Dr. Ostrer has also alleged a controversy of sufficient reality and immediacy, MedImmune, 549 U.S. at 127, 127 S.Ct. 764; he has alleged a concrete and actual injury traceable to Myriad’s assertion of its patent rights, see Lujan, 504 U.S. at 560, 112 S.Ct. 2130. First, Ostrer seeks to undertake specific BRCA related activities — BRCA diagnostic testing — for which Myriad has demanded a license under specific patents — ’those that cover the isolated BRCA genes and BRCA diagnostic testing. Thus, Ostrer does not request “an opinion advising what the law would be upon a hypothetical state of facts,” Aetna Life, 300 U.S. at 241, 57 S.Ct. 461, but rather *1346 whether his proposed BRCA testing services are covered by valid patent claims to “isolated” BRCA genes and methods of “comparing” the genes’ sequences. Second, Ostrer not only has the resources and expertise to immediately undertake clinical BRCA testing, but also states unequivocally that he will immediately begin such testing. In contrast to Ostrer, who alleges an actual and imminent injury for purposes of standing, Drs. Kazazian and Ganguly allege only that they will “consider” resuming BRCA testing. These “ ‘some day’ intentions” are insufficient to support an “actual or imminent” injury for standing “without ... any specification of when the some day will be.” Lujan, 504 U.S. at 564, 112 S.Ct. 2130. As a result, Drs. Kazazian and Ganguly do not have standing.
Myriad seeks to escape this result based on the timing of its enforcement actions. Specifically, Myriad argues that time has extinguished the immediacy and reality of any controversy, relying on language that hearkens back to our pre-Med,Immune reasonable apprehension of suit test. See, e.g., Appellant Br. 26 (“[A] patentee’s ten-year silence presumptively extinguishes any reasonable objective fear of suit.”). We disagree. In many cases a controversy made manifest by a patentee’s affirmative assertion of its patent rights will dissipate as market players and products change. In this ease, however, the relevant circumstances surrounding Myriad’s assertion of its patent rights have not changed despite the passage of time.[4]
Myriad’s active enforcement of its patent rights forced Dr. Ostrer, as well as every other similarly situated researcher and institution, to cease performing the challenged BRCA testing services, leaving Myriad as the sole provider of BRCA clinical testing to patients in the United States. Since that time, neither the accused activities nor the parties’ positions have changed. First, Myriad does not allege that genetic testing technology has changed in any way that renders its past assertions of its patent rights irrelevant to Ostrer’s currently proposed BRCA testing. Rather, the patents cover, as Myriad asserted in the late 1990s, the basic components of any such test: the isolated BRCA genes and the diagnostic step of comparing the genes’ sequences.
Second, ever since Myriad’s enforcement efforts eliminated all competition, Myriad and Ostrer have not altered their respective positions. Ostrer, still laboring under Myriad’s threat of infringement liability, has not attempted to provide BRCA testing; yet, as a researcher, he remains in the same position with respect to his ability and his desire to provide BRCA testing as in the late 1990s. Furthermore, nothing in the record suggests that any researcher or institution has successfully attempted to compete with Myriad, or that Myriad has in any way changed its position with regard to its patent rights. Just as active enforcement of one’s patent rights against others can maintain a real and immediate controversy despite the passage of time, see Micron, 518 F.3d at 901, so too can the successful assertion of such rights when the relevant circumstances remain unchanged. Thus, consistent with the purpose of the Declaratory Judgment Act, Ostrer need not risk liability and treble damages for patent infringement before seeking a declaration of his *1347 contested legal rights. See MedImmune, 549 U.S. at 134, 127 S.Ct. 764.
Myriad also argues that the record refutes Ostrer’s claim that he has been restrained from engaging in NñCA-related gene sequencing. Specifically, Myriad argues that since Myriad published its discoveries of the BRCAl and BRCA2 genes in October 1994 and March 1996, respectively, over 18,000 scientists have conducted research on the BRCA genes and over 8,600 research papers have been published. Furthermore, according to Myriad, plaintiff Wendy Chung concedes that her lab currently conducts sequencing of BRCA genes. Yet, both Drs. Chung and Ostrer state that, although they conduct gene sequencing, they are forbidden from informing their research subjects of the results of their BRCA tests without first sending the samples to Myriad. Accordingly, Ostrer is restrained from the BRCA-related activity that he desires to undertake: clinical diagnostic testing.
Myriad’s communications with Dr. Ostrer confirm this understanding. The licensing letter Myriad sent to Ostrer proposed a collaborative agreement giving NYU the right to perform “Research Tests” without payment to Myriad. J.A. 2967. “Research Tests” are defined as tests that further “non-commercial research programs, the results of which are not provided to the patient and for which no money is received.” J.A. 2965 (emphasis added). In contrast, the agreement requires payment to Myriad for each “Testing Service” performed, with “Testing Services” defined as “medical laboratory testing ... for the presence or absence of BRCAl mutations for the purpose of determining or predicting predisposition to, or assessing the risk of breast or ovarian cancer in humans.” J.A. 2966-67. Thus, Myriad’s patent enforcement actions never targeted the non-clinical BRCA research now cited by Myriad, and Ostrer’s ability to perform such research does not address the injury asserted here.
Finally, Myriad argued in its reply brief and at oral argument that Plaintiffs’ declaratory action will not afford them the relief they want, a requirement for standing. Lujan, 504 U.S. at 560-61, 112 S.Ct. 2130; see also MedImmune, 549 U.S. at 127 n. 7, 127 S.Ct. 764 (“[A] litigant may not use a declaratory-judgment action to obtain piecemeal adjudication of defenses that would not finally and conclusively resolve the underlying controversy.”). Specifically, Myriad asserts that because Plaintiffs have challenged just fifteen composition and method claims, while admitting that other unchallenged claims to BRCA probes and primers will still prevent them from engaging in BRCA sequencing, a favorable decision will not redress the Plaintiffs’ alleged injury. Again, we disagree.
The Supreme Court has required only that it is “likely,” rather than “merely ‘speculative,’ ” that the alleged injury will be “redressed by a favorable decision.” Lujan, 504 U.S. at 561, 112 S.Ct. 2130. The Court has not required certainty. For example, in Village of Arlington Heights v. Metropolitan Housing Development Corp., the Court held that the plaintiffs had standing to challenge a suburb’s exclusionary zoning ordinance, as the ordinance stood as “an absolute barrier” to the housing development Metropolitan Housing Development Corp. (“MHDC”) had contracted to provide in the village. 429 U.S. 252, 261, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The Court noted that injunctive relief, while removing the “barrier” of the ordinance, would not “guarantee” that the housing would be built since MHDC still had to secure financing, qualify for federal subsidies, and carry through with construction. Id. The Court nevertheless recognized that “all housing developments are *1348 subject to some extent to similar uncertainties,” and concluded that it was sufficient that there was a “substantial probability” that the housing development would be built. Id. at 261, 264, 97 S.Ct. 555.
In this case, Myriad’s challenged composition and method claims undisputedly provide “an absolute barrier” to Dr. Ostrer’s ability to undertake BRCA diagnostic testing activities, and a declaration of those claims’ invalidity would remove that barrier. See id. at 261, 97 S.Ct. 555. Moreover, while there may be other patent claims directed to BRCA probes and primers that prevent Ostrer from performing BRCA diagnostic testing free of infringement liability, Myriad has failed to direct us to any specific unchallenged claim that will have that effect. And Plaintiffs’ counsel stated at oral argument that his clients can sequence the BRCA genes without using BRCA probes and primers. Oral Arg. at 34:07-25, 34:53-35:29 available at http://www.cafc.uscourts.gov/oralargument-recordings/2010-1406/all. Accordingly, we decline to construe claims and hold on this record that Dr. Ostrer’s proposed BRCA-related activities would infringe unchallenged claims to primers and probes. We thus conclude that it is likely, not merely speculative, that Dr. Ostrer’s injury will be redressed by a favorable decision.
Accordingly, although we affirm the district court’s decision to exercise declaratory judgment jurisdiction, we affirm on much narrower grounds. The district court failed to limit its jurisdictional holding to affirmative acts by the patentee directed at specific Plaintiffs, see SanDisk, 480 F.3d at 1380-81, erroneously holding all the Plaintiffs had standing based on “the widespread understanding that one may engage in BRCAl/2 testing at the risk of being sued for infringement liability by Myriad,” DJ Op., at 390. We disagree, and thus we reverse the district court’s holding that the various plaintiffs other than Dr. Ostrer have standing to maintain this declaratory judgment action. Simply disagreeing with the existence of a patent or even suffering an attenuated, nonproximate, effect from the existence of a patent does not meet the Supreme Court’s requirement for an adverse legal controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. See MedImmune, 549 U.S. at 127, 127 S.Ct. 764.
Having found one plaintiff with standing to maintain this declaratory judgment action, see Horne v. Flores, — U.S. —, 129 S.Ct. 2579, 2592-93, 174 L.Ed.2d 406 (2009), we may turn now to the merits of Myriad’s appeal of the district court’s summary judgment decision, which held all fifteen challenged composition and method claims invalid under § 101.
II. Patentable Subject Matter
Under the Patent Act, “Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.” 35 U.S.C. § 101. The Supreme Court has consistently construed § 101 broadly, explaining that “[i]n choosing such expansive terms ... modified by the comprehensive ‘any,’ Congress plainly contemplated that the patent laws would be given wide scope.” Bilski v. Kappos, — U.S. —, 130 S.Ct. 3218, 3225, 177 L.Ed.2d 792 (2010) (quoting Chakrabarty, 447 U.S. at 308, 100 S.Ct. 2204).
The Supreme Court, however, has also consistently held that § 101, although broad, is not unlimited. Id. The Court’s precedents provide three judicially created exceptions to § 101’s broad patent-eligibility principles: “laws of nature, physical phenomena, and abstract ideas.” Id. (quoting Chakrabarty, 447 U.S. at 309, 100 *1349 S.Ct. 2204). The Court has also referred to these exceptions as precluding the patenting of phenomena of nature, mental processes, Gottschalk v. Benson, 409 U.S. 63, 67, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972), and products of nature, Chakrabarty, 447 U.S. at 313, 100 S.Ct. 2204 (“[T]he relevant distinction for purposes of § 101 is ... between products of nature ... and human-made inventions.”). The Court has explained that, although not required by the statutory text, “[t]he concepts covered by these exceptions are ‘part of the storehouse of knowledge of all men ... free to all men and reserved exclusively to none.’ ” Bilski, 130 S.Ct. at 3225 (quoting Funk Brothers Seed Co. v. Kalo Inoculant Co., 333 U.S. 127, 130, 68 S.Ct. 440, 92 L.Ed. 588 (1948))
Plaintiffs challenge under § 101 Myriad’s composition claims directed to “isolated” DNA molecules and method claims directed to “analyzing” or “comparing” DNA sequences. We address each in turn.
A. Composition Claims: Isolated DNA Molecules
i.
Myriad argues that its challenged composition claims to “isolated” DNAs cover patent-eligible compositions of matter within the meaning of § 101. According to Myriad, the district court came to a contrary conclusion by (1) misreading Supreme Court precedent as excluding from patent eligibility all “products of nature” unless “markedly different” from naturally occurring ones; and (2) incorrectly focusing not on the differences between isolated and native DNAs, but on one similarity: their informational content. Rather, Myriad argues, an isolated DNA molecule is patent eligible because it is, as claimed, “a nonnaturally occurring composition of matter” with “a distinctive name, character, and use.” Appellant Br. 41^42 (quoting Chakrabarty, 447 U.S. at 309-10, 100 S.Ct. 2204). According to Myriad, isolated DNA does not exist in nature, and isolated DNAs, unlike native DNAs, can be used as primers and probes for diagnosing cancer. Moreover, Myriad asserts that a categorical “products of nature” exception not only would be unworkable, as every composition of matter is, at some level, composed of natural materials, but also would be contrary to this court’s precedents, the PTO’s 2001 Utility Examination Guidelines, and Congress’s role in enacting the patent laws.
Plaintiffs respond that claims to isolated DNA molecules fail to satisfy § 101 because such claims cover natural phenomena and products of nature. According to Plaintiffs, Supreme Court precedent establishes that a product of nature is not patent eligible even if, as claimed, it has undergone some highly useful change from its natural form. Rather, Plaintiffs assert, to be patent eligible a composition of matter must also have a distinctive name, character, and use, making it “markedly different” from the natural product. In this case, Plaintiffs conclude that because isolated DNAs retain the same nucleotide sequence as native DNAs, they do not have any “markedly different” characteristics. Furthermore, according to Plaintiffs, the isolated DNA claims also have a preemptive effect, excluding anyone from working with the BRCA genes.
The government as amicus curiae does not defend the PTO’s longstanding position that isolated DNA molecules are patent eligible, arguing instead for a middle ground. Specifically, the government argues that DNA molecules engineered by man, including cDNAs,[5] are patent-eligible *1350 compositions of matter because, with rare exceptions, they do not occur in nature, either in isolation or as contiguous sequences within a chromosome. In contrast, the government asserts, isolated and unmodified genomic DNAs are not patent eligible, but rather patent-ineligible products of nature, since their nucleotide sequences exist because of evolution, not man.
At oral argument, the government illustrated its argument by way of a “magic microscope” test. Oral Arg. at 46:50-47:50. According to the government’s test, if an imaginary microscope could focus in on the claimed DNA molecule as it exists in the human body, the claim covers unpatentable subject matter. The government thus argues that because such a microscope could focus in on the claimed isolated BRCAl or BRCA2 sequences as they exist in the human body, the claims covering those sequences are not patent eligible. In contrast, the government contends, because an imaginary microscope could not focus in vivo on a cDNA sequence, which is engineered by man to splice together non-contiguous coding sequences (ie., ex-ons), claims covering cDNAs are patent eligible.
In sum, although the parties and the government appear to agree that isolated DNAs are compositions of matter, they disagree on whether and to what degree such molecules fall within the exception for products of nature. As set forth below, we conclude that the challenged claims to isolated DNAs, whether limited to cDNAs or not, are directed to patent-eligible subject matter under § 101.
ii.
The Supreme Court’s decisions in Chakrabarty and Funk Brothers set out the framework for deciding the patent eligibility of isolated DNA molecules.[6]
In Chakrabarty, the Court addressed the question whether a man-made, living microorganism is a patentable manufacture or composition of matter within the meaning of § 101. 447 U.S. at 305, 307, 100 S.Ct. 2204. The microorganisms were bacteria genetically engineered with four naturally occurring DNA plasmids, each of which enabled the breakdown of a different component of crude oil. Id. at 305, 305 n. 1, 100 S.Ct. 2204. The bacteria, as a result, could break down multiple components of crude oil, a trait possessed by no single naturally occurring bacterium and of significant use in more efficiently treating oil spills. Id. at 305, 305 n. 2, 100 S.Ct. 2204. The Court held that the bacteria qualified as patentable subject matter because the “claim is not to a hitherto unknown natural phenomenon, but to a non-naturally occurring manufacture or com *1351 position of matter — a product of human ingenuity ‘having a distinctive name, character [and] use.’ ” Id. at 309-10, 100 S.Ct. 2204 (quoting Hartranft v. Wiegmann, 121 U.S. 609, 615, 7 S.Ct. 1240, 30 L.Ed. 1012 (1887)).
To underscore the point, the Court compared Chakrabarty’s engineered bacteria with bacteria inoculants found unpatentable in Funk Brothers, again casting this case decided on obviousness in terms of § 101. See Parker v. Flook, 437 U.S. 584, 591, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978); Benson, 409 U.S. at 67, 93 S.Ct. 253. In Funk Brothers, the patentee discovered that certain strains of nitrogen-fixing bacteria associated with leguminous plants do not mutually inhibit each other. 333 U.S. at 129-30, 68 S.Ct. 440. Based on this discovery, the patentee produced (and claimed) mixed cultures of nitrogen-fixing species capable of inoculating a broader range of leguminous plants than single-species cultures. Id. The Court held that the bacteria’s qualities of non-inhibition were, “like the heat of the sun, electricity, or the qualities of metals,” the “work of nature,” and thus not patentable. Id. at 130, 68 S.Ct. 440. The Court also held that application of the newly discovered bacterial trait of non-inhibition to create a mixed bacterial culture was not a patentable advance because no species acquired a different property or use. Id. at 131, 68 S.Ct. 440. The Chakrabarty Court thus concluded that what distinguished Chakrabarty’s bacteria from those claimed in Funk Brothers, and made the former patent eligible, was that Chakrabarty’s bacteria had “markedly different characteristics from any [bacterium] found in nature” based on the efforts of the patentee. Chakrabarty, 447 U.S. at 310, 100 S.Ct. 2204.
The distinction, therefore, between a product of nature and a human-made invention for purposes of § 101 turns on a change in the claimed composition’s identity compared with what exists in nature. Specifically, the Supreme Court has drawn a line between compositions that, even if combined or altered in a manner not found in nature, have similar characteristics as in nature, and compositions that human intervention has given “markedly different,” or “distinctive,” characteristics. Id. Hartranft, 121 U.S. at 615, 7 S.Ct. 1240; see also Am. Fruit Growers v. Brogdex Co., 283 U.S. 1, 11, 51 S.Ct. 328, 75 L.Ed. 801 (1931). Applying this test to the isolated DNAs in this case, we conclude that the challenged claims are drawn to patentable subject matter because the claims cover molecules that are markedly different— have a distinctive chemical identity and nature — from molecules that exist in nature.
It is undisputed that Myriad’s claimed isolated DNAs exist in a distinctive chemical form — as distinctive chemical molecules — from DNAs in the human body, i.e., native DNA. Native DNA exists in the body as one of forty-six large, contiguous DNA molecules. Each DNA molecule is itself an integral part of a larger structural complex, a chromosome. In each chromosome, the DNA molecule is packaged around histone proteins into a structure called chromatin, which in turn is packaged into the chromosomal structure. See supra, Figure 3.
Isolated DNA, in contrast, is a freestanding portion of a native DNA molecule, frequently a single gene. Isolated DNA has been cleaved (i.e., had covalent bonds in its backbone chemically severed) or synthesized to consist of just a fraction of a naturally occurring DNA molecule. For example, the BRCAl gene in its native state resides on chromosome 17, a DNA molecule of around eighty million nucleotides. Similarly, BRCA2 in its native state is located on chromosome 13, a DNA of *1352 approximately 114 million nucleotides. In contrast, isolated BRCAl and BRCA2, with introns, each consists of just 80,000 or so nucleotides. And without introns, BRCA2 shrinks to just 10,200 or so nucleotides and BRCAl to just around 5,500 nucleotides. Furthermore, claims 5 and 6 of the '282 patent cover isolated DNAs having as few as fifteen nucleotides of a BRCA sequence. Accordingly, BRCAl and BRCA2 in their isolated state are not the same molecules as DNA as it exists in the body; human intervention in cleaving or synthesizing a portion of a native chromosomal DNA imparts on that isolated DNA a distinctive chemical identity from that possessed by native DNA.
As the above description indicates, isolated DNA is not purified DNA. Purification makes pure what was the same material, but was previously impure. Although isolated DNA must be removed from its native cellular and chromosomal environment, it has also been manipulated chemically so as to produce a molecule that is markedly different from that which exists in the body. It has not been purified by being isolated. Accordingly, this is not a situation, as in Parke-Davis & Co. v. H.K. Mulford Co., in which purification of adrenaline resulted in the identical molecule being “for every practical purpose a new thing commercially and therapeutically.” 189 F. 95, 103 (C.C.S.D.N.Y.1911). Although, we note, Judge Learned Hand held the claimed purified “Adrenalin” to be patentable subject matter. Id. The In re Marden cases are similarly inapposite,[7] directed as they are to the patent ineligibility of purified natural elements — ductile uranium, 18 CCPA 1046, 47 F.2d 957 (1931), and vanadium, 18 CCPA 1057, 47 F.2d 958 (1931) — that are inherently ductile in purified form. Parke-Davis and Marden address a situation in which claimed compound A is purified from a physical mixture that contains compound A. In this case, the claimed isolated DNA molecules do not exist as in nature within a physical mixture to be purified. They have to be chemically cleaved from their chemical combination with other genetic materials. In other words, in nature, isolated DNAs are covalently bonded to such other materials. Thus, when cleaved, an isolated DNA molecule is not a purified form of a natural material, but a distinct chemical entity. In fact, some forms of isolated DNA require no purification at all, because DNAs can be chemically synthesized directly as isolated molecules.
The dissent disparages the significance of a “chemical bond,” presumably meaning a covalent bond, in distinguishing structurally between one molecular species and another. But a covalent bond is the defining boundary between one molecule and another. The dissent’s citation of Linus Pauling’s comment that covalent bonds *1353 “make it convenient for the chemist to consider [the aggregate] as an independent molecular species” underlines the point. The covalent bonds in this case separate one chemical species from another.
Plaintiffs argue that because the claimed isolated DNAs retain the same nucleotide sequence as native DNAs, they do not have any “markedly different” characteristics. This approach, however, looks not at whether isolated DNAs are markedly different — have a distinctive characteristic— from naturally occurring DNAs, as the Supreme Court has directed, but at one similarity: the information content contained in isolated and native DNAs’ nucleotide sequence. Adopting this approach, the district court disparaged the patent eligibility of isolated DNA molecules because their genetic function is to transmit information. We disagree, as it is the distinctive nature of DNA molecules as isolated compositions of matter that determines their patent eligibility rather than their physiological use or benefit. Uses of chemical substances may be relevant to the non-obviousness of these substances or to method claims embodying those uses, but the patent eligibility of an isolated DNA is not negated because it has similar informational properties to a different, more complex natural material that embodies it. The claimed isolated DNA molecules are distinct from their natural existence as portions of larger entities, and their informational content is irrelevant to that fact. We recognize that biologists may think of molecules in terms of their uses, but genes are in fact materials having a chemical nature and, as such, are best described in patents by their structures rather than their functions.
The district court in effect created a categorical rule excluding isolated genes from patent eligibility. See SJ Op., at 228-29. But the Supreme Court has “more than once cautioned that courts ‘should not read into the patent laws limitations and conditions which the legislature has not expressed,’ ” Bilski, 130 S.Ct. at 3226 (quoting Diamond v. Diehr, 450 U.S. 175, 182, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981)), and has repeatedly rejected new categorical exclusions from § 101’s scope, see id. at 3227-28 (rejecting the argument that business method patents should be categorically excluded from § 101); Chakrabarty, 447 U.S. at 314-17, 100 S.Ct. 2204 (same for living organisms). We therefore reject the district court’s unwarranted categorical exclusion of isolated DNA molecules.
Because isolated DNAs, not just cDNAs, have a markedly different chemical structure compared to native DNAs, we reject the government’s proposed “magic microscope” test, as it misunderstands the difference between science and invention and fails to take into account the existence of molecules as separate chemical entities. The ability to visualize a DNA molecule through a microscope, or by any other means, when it is bonded to other genetic material, is worlds apart from possessing an isolated DNA molecule that is in hand and usable. It is the difference between knowledge of nature and reducing a portion of nature to concrete form, the latter activity being what the patent laws seek to encourage and protect. The government’s microscope could focus in on a claimed portion of any complex molecule, rendering that claimed portion patent ineligible, even though that portion never exists as a separate molecule in the body or anywhere else in nature, and may have an entirely different utility. That would discourage innovation. One cannot visualize a portion of a complex molecule, including a DNA containing a particular gene, and will it into isolation as a unique entity. Visualization does not cleave and isolate the particular DNA; that is the act of human invention.
*1354 The parties and amici have provided many thought-provoking hypothetical, each of which raises a complicated issue of patent eligibility not before the court. Accordingly, wé address them only briefly; courts decide cases, they do not draft legal treatises. It is suggested that holding isolated DNAs patent eligible opens the door to claims covering isolated chemical elements, like lithium; minerals found in the earth, like diamonds; atomic particles, like electrons; and even organs, like a kidney, and a leaf from a tree. None of these examples, however, as far as we can discern, presents the case of a claim to a composition having a distinctive chemical identity from that of the native element, molecule, or structure. Elemental lithium is the same element whether it is in the earth or isolated; the diamond is the same lattice of carbon molecules, just with the earth removed; the kidney is the same kidney, the leaf the same leaf. Some may have a changed form, quality, or use when prepared in isolated or purified form, but we cannot tell on this record whether the changes are sufficiently distinctive to make the composition markedly different from the one that exists in nature. In contrast, a portion of a native DNA molecule — an isolated DNA — -has a markedly different chemical nature from the native DNA. It is, therefore, patentable subject matter.
The dissent indicates that we “acknowledge!;] that elemental lithium (like other elements) would not be patentable subject matter because it ‘is the same element whether it is in earth or isolated.’ ” Again, these facts are not before us, so we do not attempt to evaluate the patentability of one form of lithium over another. Suffice it to say, however, that if lithium is found in the earth as other than elemental lithium, such as “in molecular form” “because it reacts with air and water,” it is not the same material as elemental lithium.
It is also important to dispute the dissent’s analogy to snapping a leaf from a tree. With respect, no one could contemplate that snapping a leaf from a tree would be worthy of a patent, whereas isolating genes to provide useful diagnostic tools and medicines is surely what the patent laws are intended to encourage and protect. Snapping a leaf from a tree is a physical separation, not one creating a new chemical entity.
The dissent also mentions several times in its opinion the breadth of certain claims as grounds for objecting to their patentability. However, we do not have here any rejection or invalidation on the various grounds relating to breadth, such as in 35 U.S.C. § 112. The issue before us is patent eligibility, not the adequacy of the patents’ disclosure to support particular claims.
Finally, our decision that isolated DNA molecules are patent eligible comports with the longstanding practice of the PTO. The Supreme Court has repeatedly stated that changes to longstanding practice should come from Congress, not the courts. In J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred International, Inc., the Court rejected the argument that plants did not fall within the scope of § 101, relying in part on the fact that “the PTO has assigned utility patents for plants for at least 16 years and there has been no indication from either Congress or agencies with expertise that such coverage is inconsistent with [federal law].” 534 U.S. 124, 144-45, 122 S.Ct. 593, 151 L.Ed.2d 508 (2001) ; see also Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 739, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002) (“[C]ourts must be cautious before adopting changes that disrupt the settled expectations of the inventing community.” (citing Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 28, 117 S.Ct. *1355 1040, 137 L.Ed.2d 146 (1997))); Ariad Pharm., Inc. v. Eli Lilly & Co., 598 F.3d 1336, 1347 (Fed.Cir.2010) (upholding a written description requirement separate from enablement based in part on stare decisis).
In this case, the PTO has issued patents directed to DNA molecules for almost thirty years. In the early 1980s, the Office granted the first human gene patents. See Eric J. Rogers, Can You Patent Genes? Yes and No, 93 J. Pat. & Trademark Off. Soc’y 19 (2010). It is estimated that the PTO has issued 2,645 patents claiming “isolated DNA” over the past twenty-nine years, J.A. 3710, and that by 2005, had granted 40,000 DNA-related patents covering, in non-native form, twenty percent of the genes in the human genome, Rogers, supra at 40. In 2001, the PTO issued Utility Examination Guidelines, which reaffirmed the agency’s position that isolated DNA molecules are patent eligible, 66 Fed. Reg. 1092-94 (Jan. 5, 2001), and Congress has not indicated that the PTO’s position is inconsistent with § 101. If the law is to be changed, and DNA inventions excluded from the broad scope of § 101 contrary to the settled expectation of the inventing community, the decision must come not from the courts, but from Congress.
II. Method Claims
We turn next to Myriad’s challenged method claims. The district court’s decision predated the Supreme Court’s decision in Bilski, which rejected this court’s machine-or-transformation test as the exclusive test for determining whether an invention is a patent-eligible process under § 101, although the test remains “a useful and important clue.” 130 S.Ct. at 3227. Both parties, however, had the opportunity to address the Court’s decision in briefing and at oral arguments. Accordingly, we proceed to the merits, and we conclude that all but one of Myriad’s method claims are directed to patent-ineligible, abstract mental processes, and fail the machine-or-transformation test.
A. Methods of “Comparing” or “Analyzing” Sequences
Myriad argues that its claims to methods of “comparing” or “analyzing” BRCA sequences satisfy the machine-or-transformation test as applied by this court in Prometheus because each requires a transformation — extracting and sequencing DNA molecules from a human sample — before the sequences can be compared or analyzed. According to Myriad, the district court failed to recognize the transformative nature of the claims by (1) misconstruing the claim term “sequence” as just information, rather than a physical molecule; and (2) erroneously concluding, in the alternative, that Myriad’s proposed transformations were mere data-gathering steps, rather than central to the purpose of the claims.
Plaintiffs respond that these method claims are drawn to the abstract idea of comparing one sequence to a reference sequence and preempt a phenomenon of nature — the correlation of genetic mutations with a predisposition to cancer. And, according to the Plaintiffs, limiting the claims’ application to a specific technological field, i.e., BRCA gene sequences, is insufficient to render the claims patent eligible. Plaintiffs also assert that the claims do not meet the machine-or-transformation test because the claims’ plain language includes just the one step of “comparing” or “analyzing” two gene sequences.
We conclude that Myriad’s claims to “comparing” or “analyzing” two gene sequences fall outside the scope of § 101 because they claim only abstract mental processes. See Benson, 409 U.S. at 67, 93 S.Ct. 253 (“Phenomena of nature, ... mental processes, and abstract intellectual con *1356 cepts are not patentable, as they are the basic tools of scientific and technological work.”). The claims recite, for example, a “method for screening a tumor sample,” by “comparing” a first BRCAl sequence from a tumor sample and a second BRCAl sequence from a non-tumor sample, wherein a difference in sequence indicates an alteration in the tumor sample. '001 patent claim 1. This claim thus recites nothing more than the abstract mental steps necessary to compare two different nucleotide sequences: look at the first position in a first sequence; determine the nucleotide sequence at that first position; look at the first position in a second sequence; determine the nucleotide sequence at that first position; determine if the nucleotide at the first position in the first sequence and the first position in the second sequence are the same or different, wherein the latter indicates an alternation; and repeat for the next position.
Limiting the comparison to just the BRCA genes or, as in the case of claim 1 of the '999 patent, to just the identification of particular alterations, fails to render the claimed process patent eligible. As the Supreme Court has held, “the prohibition against patenting abstract ideas ‘cannot be circumvented by attempting to limit the use of the formula to a particular technological environment.’ ” Bilski, 180 S.Ct. at 3230 (quoting Diehr, 450 U.S. at 191-92, 101 S.Ct. 1048); see also id. at 3231 (“Flook established that limiting an abstract idea to one field of use ... did not make the concept patentable.”). Although the application of a formula or abstract idea in a process may describe patentable subject matter, id. at 3230, Myriad’s claims do not apply the step of comparing two nucleotide sequences in a process. Rather, the step of comparing two DNA sequences is the entire process claimed.
To escape this result, Myriad attempts to read into its method claims additional, transformative steps. As described above, Myriad reads into its claims the steps of (1) extracting DNA from a human sample, and (2) sequencing the BRCA DNA molecule, arguing that both steps necessarily precede the step of comparing nucleotide sequences. The claims themselves, however, do not include either of these steps. The claims do not specify any action prior to the step of “comparing” or “analyzing” two sequences; the claims recite just the one step of “comparing” or “analyzing.” Moreover, those terms’ plain meaning does not include Myriad’s proposed sample-processing steps; neither comparing nor analyzing means or implies “extracting” or “sequencing” DNA or otherwise “processing” a human sample.
Myriad claims that “comparing” and “analyzing” take on this meaning when read in light of the patent specifications. Specifically, Myriad argues that the specifications show that the claim term “sequence” refers not to information, but rather to a physical DNA molecule, whose sequence must be determined before it can be compared. We disagree. The patent specifications make clear that “sequence” does not exclusively specify a DNA molecule, but refers more broadly to the linear sequence of nucleotide bases of a DNA molecule. For example, Figure 10A-10H is described as showing the “genomic sequence of BRCAl.” '473 patent col.5 1.66. Figure 10 does not show a physical DNA molecule; the figure lists a series of letters (Gs, As, Ts, and Cs) corresponding to the nucleotides guanine, adenine, thymine, and cytosine of a DNA molecule. Similarly, the patent specifications state that “[t]he nucleotide sequence for BRCAl exon 4 is shown in SEQ ID NO: 11.” Id. col.53 11.50-53. SEQ ID NO: 11 again lists a series of Gs, As, Ts, and Cs corresponding to the nucleotide sequence of BRCAl exon 4.
*1357 Accordingly, Myriad’s challenged method claims are distinguishable from the claims upheld under § 101 in Prometheus. In Prometheus, the patents claimed methods for optimizing the dosage of thiopurine drugs administered to patients with gastrointestinal disorders. 628 F.3d at 1350. As written, the claimed methods included the steps of (a) “administering” a thiopurine drug to a subject, and/or (b) “determining” the drug’s metabolites levels in the subject, wherein the measured metabolite levels are compared with predetermined levels to optimize drug dosage. Id. In holding that the claims satisfied § 101, this court concluded that, in addition to the “administering” step being transformative, the “determining” step was both transformative and central to the purpose of the claims. Id. at 1357. Specifically, the court held that because the metabolite levels could not be determined by mere inspection, the determining step necessarily required a transformation: “Some form of manipulation ... is necessary to extract the metabolites from a bodily sample and determine their concentration.” Id. Moreover, we concluded that this transformation was not just insignificant extra-solution activity or necessary data-gathering steps, but was central to the claims, because determining the metabolite levels was what enabled the optimization of drug dosage. Id.
Myriad’s claims, in contrast, do not include the step of “determining” the sequence of BRCA genes by, e.g., isolating the genes from a blood sample and sequencing them, or any other necessarily transformative step. Rather, the comparison between the two sequences can be accomplished by mere inspection alone. Accordingly, Myriad’s claimed methods of comparing or analyzing nucleotide sequences fail to satisfy the maehine-ortransformation test, and are instead directed to the abstract mental process of comparing two nucleotide sequences. The claims thus fail to claim a patent-eligible process under § 101.
B. Method of Screening Potential Cancer Therapeutics
Lastly, we turn to Myriad’s method claim directed to a method for screening potential cancer therapeutics via changes in cell growth rates. '282 patent claim 20. Plaintiffs challenge this claim as directed to the abstract idea of comparing the growth rates of two cell populations and as preempting a basic scientific principle — that a slower growth rate in the presence of a potential therapeutic compound suggests that the compound is a cancer therapeutic. We disagree.
Starting with the machine-or-transformation test, we conclude that the claim includes transformative steps, an “important clue” that it is drawn to a patent-eligible process. Bilski, 130 S.Ct. at 3227. Specifically, the claim recites a method that comprises the steps of (1) “growing” host cells transformed with an altered BRCAl gene in the presence or absence of a potential cancer therapeutic, (2) “determining” the growth rate of the host cells with or without the potential therapeutic, and (3) “comparing” the growth rate of the host cells. The claim thus includes more than the abstract mental step of looking at two numbers and “comparing” two host cells’ growth rates. The claim includes the steps of “growing” transformed cells in the presence or absence of a potential cancer therapeutic, an inherently transformative step involving the manipulation of the cells and their growth medium. The claim also includes the step of “determining” the cells’ growth rates, a step that also necessarily involves physical manipulation of the cells. Furthermore, these steps are central to the purpose of the claimed process. See Prometheus, 628 F.3d at 1356-57, 1358 (quoting In re Bilski, 545 F.3d at 962). *1358 The goal of the claim is to assess a compound’s potential as a cancer therapeutic, and growing the cells and determining their growth rate is what achieves that goal.
Furthermore, the claim is not so “manifestly abstract” as to claim only a scientific principle, and not a patent-eligible process. See Research Corp. Techs., Inc. v. Microsoft Corp., 627 F.3d 859, 869 (Fed.Cir.2010). The claim does not cover all cells, all compounds, or all methods of determining the therapeutic effect of a compound. Rather, it is tied to specific host cells transformed with specific genes and grown in the presence or absence of a specific type of therapeutic. Moreover, the claim is tied to measuring a therapeutic effect on the cells solely by changes in the cells’ growth rate. The claim thus presents “functional and palpable applications” in the field of biotechnology. Id. at 868; see also Prometheus, 628 F.3d at 1355 (“[T]he claims do not preempt all uses of the natural correlations; they utilize them in a series of specific steps.”). Accordingly, we hold that claim 20 of the '282 patent claims patentable subject matter under § 101.
Conclusion
For the foregoing reasons, we affirm the district court’s decision to exercise declaratory judgment jurisdiction over this case, we reverse the district court’s grant of summary judgment with regard to Myriad’s composition claims to isolated DNAs, we affirm the district court’s grant of summary judgment with regard to Myriad’s method claims to comparing or analyzing gene sequences, and we reverse the district court’s grant of summary judgment with regard to Myriad’s method claim to screening potential cancer therapeutics via changes in cell growth rates.
AFFIRMED IN PART and REVERSED IN PART
No costs.

. The district court's opinion, SJ Op., at 192-203, contains a detailed and comprehensive discussion of the science involved in this case. We repeat only the basics here.

. Covalent bonds are chemical bonds characterized by the sharing of electrons between atoms in a molecule.

. Certain patients also allege an injury based on their inability to gain access to affordable BRCA genetic testing because of Myriad’s patent dominance of such services. While denial of health services can, in certain circumstances, state a judicially cognizable injury, see Simon, 426 U.S. at 40-41, 96 S.Ct. 1917, Plaintiffs have not pressed this as an independent ground for standing. Moreover, we fail to see how the inability to afford a patented invention could establish an invasion of a legally protected interest for purposes of standing.

. Myriad's analogy to laches is also unconvincing. Laches bars the recovery of prefiling damages; it does not preclude a patent action for prospective relief, the type of relief sought here. See A.C. Aukerman Co. v. R.L. Chaides Const. Co., 960 F.2d 1020, 1041 (Fed.Cir.1992) (en banc) ("[L]aches bars relief on a patentee’s claim only with respect to damages accrued prior to suit.”).

. According to the government, several of the composition claims at issue in this suit, in-eluding claim 2 of the '282 patent, are limited to cDNA and thus patent eligible.

. Other Supreme Court decisions cited by the parties and amici were decided based on lack of novelty, not patentable subject matter. In American Wood-Paper Co. v. Fibre Disintegrating Co., the Court held the challenged patent “void for want of novelty in the manufacture patented,” because the "[p]aper-pulp obtained from various vegetable substances was in common use before the original patent was granted ..., and whatever may be said of their process for obtaining it, the product was in no sense new.” 90 U.S. 566, 596, 23 Wall. 566, 23 L.Ed. 31 (1874). Similarly, in Cochrane v. Badische Anilin & Soda Fabrik, the Court held that a claim to artificial alizarine covered an old and well-known substance, the alizarine of madder, which could not be patented although made artificially for the first time. 111 U.S. 293, 311, 4 S.Ct. 455, 28 L.Ed. 433 (1884); see also id. at 308-09, 4 S.Ct. 455 ("It is very plain that the specification of the original patent, No. 95,465, states the invention to be a process for preparing alizarine, not as a new substance prepared for the first time, but as the substance already known as alizarine, to be prepared, however, by the new process, which process is to be the subject of the patent, and is the process of preparing the known product alizarine from anthracine.” (emphases added)).

. We note that Bergy is no longer binding law. Bergy was the companion case to Charkarbarty, and was vacated by the Supreme Court and remanded for dismissal as moot. Diamond v. Chakrabarty, 444 U.S. 1028, 100 S.Ct. 700, 62 L.Ed.2d 666 (1980). Other CCPA cases cited by the parties and amici were not decided based on patent eligibility. In In re Bergstrom, the court held that pure prostaglandin compounds, PGE(2) and PGE(3), were improperly rejected as lacking novelty. 57 CCPA 1240, 427 F.2d 1394, 1394 (1970); see Bergy, 596 F.2d at 961 (recognizing Bergstrom as a case decided under § 102). Similarly in In re Kratz, the court held non-obviousness claims to synthetically produced, substantially pure 2-methyl-2-pentenoic acid ("2M2PA”), a chemical that gives strawberries their flavor. 592 F.2d 1169, 1170 (CCPA 1979); see also In re King, 27 CCPA 754, 107 F.2d 618, 619 (1939) (holding claims to vitamin C invalid for lack of novelty, as "[ajppellants were not the first to discover or produce [vitamin C] in its pure form”); In re Merz, 25 CCPA 1314, 97 F.2d 599, 601 (1938) (holding claims to artificial ultramarine that contains non-floatable impurities invalid as not "inventive,” and thus as obvious).