Alan and Keri BEARDER, individually and as parents and natural guardians of Josiah and Alexa Bearder, minors, et al., Appellants,

v.

STATE of Minnesota, et al., Respondents.

No. A10–101.

Court of Appeals of Minnesota.

Aug. 24, 2010.

Daniel J. Bellig, Randall G. Knutson, Farrish Johnson Law Office, Mankato, MN, for appellant.

Lori Swanson, Attorney General, Jocelyn F. Olson, Assistant Attorney General, St. Paul, MN, for respondents.

Considered and decided by HUDSON, Presiding Judge; MINGE, Judge; and MUEHLBERG, Judge.

## OPINION

MUEHLBERG, Judge.*

Appellants challenge the district court's grant of summary judgment to respondents, the State of Minnesota and the Minnesota Department of Health and its commissioner (collectively, "respondents"), on appellants' claims that respondents' collection, retention, use, or dissemination of appellant-children's blood in conjunction with a state-mandated newborn screening program violated their statutory and constitutional privacy rights, and their constitutional right to be free from unlawful governmental taking of their property. The district court did not err by granting summary judgment because (1) respondents' conduct was authorized by the newborn screening statute; (2) appellants did not allege conduct that would have fallen outside the newborn screening statute; and (3) respondents' conduct does not support separate tort or constitutional claims that are dependent upon unlawful conduct. We therefore affirm.

## FACTS

Appellants include 25 children,[1] born between July 1998 and December 2008, whose blood was tested for heritable and congenital disorders as part of a public health initiative authorized by the newborn screening statute. Together with their 17 parents, they claim that their biological specimens and genetic information, obtained during the newborn screenings, constitute private data on individuals subject to the genetic privacy act. They claim that such genetic information could be collected, stored, used or disseminated only after respondent Minnesota Department of Health (the health department) obtained written informed consent on behalf of the children.[2] The interplay between these two statutes is critical to this appeal.

In 1965, Minnesota began to test newborns, as a matter of public health, for metabolic disorders, including phenylketonuria and other diseases. The current program screens newborns within five

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

1. The first amended complaint included 28 children, but three children were voluntarily dismissed as plaintiffs from the case.

2. The genetic privacy act became effective on August 1, 2006, and it "applies to genetic information collected on or after that date." 2006 Minn. Laws ch. 253, § 4.

days of birth, testing their blood for more than 50 such disorders. Screening is conducted by collecting a few drops of a newborn's blood on a filter paper specimen card provided by the health department. *See* Minn. R. 4615.0400 (2009) (defining "specimen" as "dried blood from the newborn infant collected on a specimen card"). Each year, more than 73,000 Minnesota newborns are screened, and approximately 100 are discovered to have a confirmed disorder.

Newborn screening is conducted under the authority of the newborn screening statute, which requires the commissioner of health (the commissioner) to prescribe the manner of testing, recording, and reporting of newborn screening results; mandates those who perform screenings to advise parents that the blood specimens and test results may be retained; and permits parents either to decline to have their infants tested or to require destruction of the blood specimens or test results following screening. Minn.Stat. §§ 144.125–128. *See* Minn. R. 4615.0300–.0700 (2009). The statute provides that any blood specimen remaining after a screening test may be stored by the health department within the following parameters:

> Persons with a duty to perform testing ... shall advise parents of infants (1) that the blood or tissue samples used to perform testing thereunder as well as the results of such testing may be retained by the Department of Health, (2) the benefit of retaining the blood or tissue sample, and (3) that the following options are available to them with re-

spect to the testing: (i) to decline to have the tests, or (ii) to elect to have the tests but to require that all blood samples and records of test results be destroyed within 24 months of the testing. If the parents of an infant object in writing to testing ... or elect to require that blood samples and test results be destroyed, the objection or election shall be recorded on a form that is signed by a parent or legal guardian and made part of the infant's medical record. A written objection exempts an infant from the requirements of this section and section 144.128 [list of commissioner's duties with regard to infant screening process].

Minn.Stat. § 144.125, subd. 3. The statute also requires the commissioner to destroy blood specimens within 45 days of receiving a parental request to do so. Minn. Stat. § 144.128(5). The health department publishes an informational pamphlet on the infant-screening program, informing parents of the screening process and opt-out provisions, and stating that "[a]ny bit of leftover blood (without baby's personal information) may be used for public health studies and research to improve screening and protect babies." [3]

The health department entered into a contract with Mayo Collaborative Services, Inc. d/b/a/ Mayo Medical Laboratories (Mayo) under which the health department pays Mayo in excess of $6 million to conduct the screening tests for some of the newborn blood specimens. According to the health department, Mayo has testing equipment that is more sophisticated than

**3.** In 2005, an administrative law judge reviewed and substantially recommended approval of proposed rule changes for the infant screening program, noting that the statute "expressly authorizes the collection of genetic information ... without written informed consent," but ruling that the statute did not expressly permit the health department to retain genetic information indefinitely. Despite the administrative law judge's recommendation, the commissioner did not adopt the proposed rules. Soon after, appellants initiated this lawsuit.

the equipment available to the health department. Subject to the parties' contract, Mayo is authorized to conduct further research on the blood specimens only upon proper authorization from several governmental and medical review boards. Further, Mayo is required either to make the blood specimens unidentifiable or to obtain written informed consent from the subject's parents. Mayo must destroy stored blood tests after two years.

Appellants claim that despite the prohibitions of the genetic privacy act, respondents stored more than 1,500,000 screening records and more than 800,000 newborn blood specimens, and conducted additional public-health research on more than 50,000 blood specimens, all without the written informed consent required by the genetic privacy act.[4] In addition to claiming a violation of the genetic privacy act, appellants also asserted various tort claims: intrusion upon seclusion, battery, negligence, intentional and negligent infliction of emotional distress, conversion, trespass to personalty, fraud and misrepresentation. They also asserted state and federal constitutional claims based on privacy rights, and state and federal governmental taking claims. They sought money damages and injunctive relief to enjoin respondents from continuing to "collect, store, use and disseminate genetic information without informed written consent."

Within a month after the case was filed, respondents moved to dismiss the case or, alternatively, for summary judgment. Respondents offered the affidavit of Matthew Zerby, a health program representative for the newborn screening program who maintains and provides program statistics and serves as a business analyst. Zerby reviewed the records of the subject children and concluded that "MDH records indicate that no blood specimens from any of the 26 children named in the First Amended Complaint was used in public health studies or research. With respect to the remaining two children, MDH has no records indicating their specimens were used in public health studies or research."[5]

Following a hearing, the district court granted respondents' alternative motion for summary judgment or dismissal of the case. The district court ruled that the genetic privacy act did not apply to the 16 children who were born before the effective date of the genetic privacy act. As to the remaining nine children, the district court ruled that the genetic privacy act did not apply to them for two reasons. First, the district court determined that under the genetic privacy act, newborn screening was conducted on biological samples, not genetic information, and the genetic privacy act therefore did not apply. Second, the court ruled that newborn screening under the newborn screening statute is exempted from the genetic privacy act, which regulates the use of genetic information "unless otherwise expressly provided by law." Minn.Stat. § 13.386, subd. 3. Finally, the district court ruled that appellants did not establish any other viable claims, stating:

4. In answers to appellants' requests for admissions, respondents admitted to using, as of December 31, 2008, more than 50,000 blood specimens for research and admitted to storing more than 800,000 blood tests, but they claim that their research was limited to "quality assurance, quality improvement for existing screening tests, evaluation and feasibility of new screening tests and non-newborn screening efforts in the realm of emerging public health studies."

5. Zerby's affidavit included the three children who were later dismissed as plaintiffs in the case.

Despite the voluminous filings and a myriad of counts, the Court is unable to uncover any viable claim. The remedy sought is not one the Court can impose. Plaintiffs' concerns regarding retention and use of the blood samples and test results are fully addressed by the remedies in the [newborn screening] program statute and Plaintiffs can avail themselves of these remedies at any time. Plaintiffs should press their concerns to the legislature if they deem these remedies unsatisfactory.

In the absence of a cognizable claim, the Court acknowledges its inability to cite to, or refer to, any applicable case law. Plaintiffs simply have failed to state a claim upon which relief can be granted and the numerous appended claims must be denied.

This appeal follows.

## ISSUE

Did the district court err by dismissing appellants' claims?

## ANALYSIS

The district court alternatively dismissed the case for failure to state a claim and granted summary judgment in favor of respondents. A motion to dismiss for failure to state a claim under Minn. R. Civ. P. 12.02(e) is converted to a motion for summary judgment if "matters outside the pleading are presented to and not excluded by the court." Minn. R. Civ. P. 12.02. Here, the parties attached affidavits and other evidence to their court submissions, and such materials were not excluded by the district court. Therefore, the decision reached by the district court should be treated as a grant of summary judgment. Minn. R. Civ. P. 56.01.

On appeal from summary judgment, this court reviews the record to "determine whether there are any genuine issues of material fact and whether a party is entitled to judgment as a matter of law." *In re Collier*, 726 N.W.2d 799, 803 (Minn. 2007). This court views the evidence in the record "in the light most favorable to the party against whom judgment was granted." *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn.1993). But when a motion for summary judgment is made, an adverse party may not rest on mere averments or denials but must present specific facts showing that there is a genuine issue for trial. Minn. R. Civ. P. 56.05. A genuine issue of material fact exists if the evidence would "permit reasonable persons to draw different conclusions." *Gradjelick v. Hance*, 646 N.W.2d 225, 231 (Minn.2002). No genuine issue of material fact exists when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 69 (Minn.1997) (quotation omitted); *see Murphy v. Country House, Inc.*, 307 Minn. 344, 351, 240 N.W.2d 507, 512 (1976) (stating genuine issue must be established by "substantial evidence" or evidence sufficient to avoid a directed verdict at trial).

[T]o raise a genuine issue of material fact the nonmoving party must present more than evidence which merely creates a metaphysical doubt as to a factual issue and which is not sufficiently probative with respect to an essential element of the nonmoving party's case to permit reasonable persons to draw different conclusions.

*Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 364 (Minn.2009) (quotation omitted).

### A. Newborn Screening Statute

As to the collection and retention of newborn blood samples for the newborn screening process, those functions are authorized by the newborn screening statute

and by the rules emanating from that statute. *See* Minn. R. ch. 4615. Minn.Stat. § 144.125, subd. 3, specifically provides that "the blood or tissue samples used to perform testing ... as well as the results of such testing may be retained by the Department of Health...." *See also* Minn. R. 4615.0600 (requiring the department to "maintain a record of all cases"); Minn. R. 4615.0760, subps. 4, 5 (2009) (requiring the department to maintain registry of cases with minimum data on each patient, classifying data as private).

Although the newborn screening statute does not directly address the health department's authority to conduct testing to support its implementation of the newborn screening program, such testing is permitted by statutes setting forth the general powers and duties of the commissioner, including Minn.Stat. § 144.05, subd. 1(a) (2008), which authorizes the commissioner to "[c]onduct studies and investigations, collect and analyze health and vital data, and identify and describe health problems[.]" Further, under Minn.Stat. § 144.125, subd. 1, the commissioner is granted broad authority to order newborn testing "in the manner prescribed by the commissioner." And under Minn.Stat. § 144.1255, subd. 2, the activities of an advisory committee to the commissioner include collecting information on the "efficacy and reliability of various tests for heritable and congenital disorders," the "availability and efficacy of treatments for heritable and congenital disorders," and the "severity of medical conditions caused by heritable and congenital disorders." This statute expressly authorizes the commissioner to conduct health studies in carrying out its public-health mandate to collect information relevant to refining and improving the newborn screening program.

The statute also directs the advisory committee to discuss and assess the benefits of performing particular tests, including considering "other potential disadvantages of requiring the tests." *Id.* at subd. 2(4). In addition, the health department pamphlet informs new parents that "[a]ny bit of leftover blood (without baby's personal information) may be used for public health studies and research to improve screening and protect babies." Thus, under its general authority and as mandated by the newborn screening statute, the commissioner has authority to retain blood specimens after testing to be used for further newborn screening-related research, such as to make improvements to newborn screening tests or to otherwise refine the newborn screening program for public health purposes. *See, e.g., Ly v. Nystrom,* 615 N.W.2d 302, 308 (Minn.2000) (construing broadly consumer statute designed to protect public); *see also* Minn.Stat. § 144.05, subd. 1(a) (2008) (stating that commissioner shall have authority to organize public health programs "for protecting, maintaining, and improving the health of the citizens").

■ Appellants argue that the genetic privacy act restricts or overrides the authority of the health department and commissioner with regard to the newborn screening process. In addressing this claim, we must evaluate the statutory language of the genetic privacy act, which was enacted to protect privacy interests, to determine how it affects the newborn screening process, which was enacted to protect public health. The genetic privacy act limits the "collection, storage, use and dissemination of genetic information" by requiring written informed consent before use of the information "unless otherwise expressly provided by law." Minn.Stat. § 13.386, subd. 3. Critical to our decision is whether the newborn screening statute

and other public-health statutes that grant the commissioner broad authority to execute its duties constitute an express provision of law that makes the genetic privacy act inapplicable. Our construction of the word "expressly" thus determines this issue.

■ We must construe statutory language "according to the rules of grammar and according to [its] common and approved usage." Minn.Stat. § 645.08(1) (2008). Further, "[a] statute should be interpreted, whenever possible, to give effect to all of its provisions; no word, phrase, or sentence should be deemed superfluous, void, or insignificant." *Am. Family Ins. Group, v. Schroedl,* 616 N.W.2d 273, 277 (Minn.2000) (quotation omitted). And, "[w]hen a general provision in a law is in conflict with a special provision in the same or another law, the two shall be construed, if possible, so that effect may be given to both." Minn.Stat. § 645.26, subd. 1 (2008). *See also* Minn. Stat. § 645.17(5) (2008) (setting forth presumption that "the legislature intends to favor the public interest as against any private interest").

Applying these principles, we conclude that Minn.Stat. § 144.125–.128 and other governing legislation granting the commissioner broad authority to manage the newborn screening program amount to an "express" provision of law that authorizes collection, retention, use and dissemination of blood specimens for the newborn screening program, making the genetic privacy act inapplicable.[6] *See Black's Law Dictionary* 661 (9th ed.2009) (defining "express" as "[c]learly and unmistak-

ably communicated; directly stated" and constrasting that definition with "implied"). Thus, we conclude that, to the extent that respondents' conduct comes under the purview of the newborn screening statute, the genetic privacy act does not apply, and the district court properly granted summary judgment on that issue.

**B.   Use of Newborn Blood for Purposes Other Than the Newborn Screening Program.**

■ Appellants claim that the genetic privacy act "applies to conduct after initial newborn screening is complete." Because the newborn screening statute specifically permits the retention and use of blood specimens for purposes related to the newborn screening program, this allegation is contradicted by the newborn screening statute and is therefore without merit. But appellants also claim that the genetic privacy act prohibits any newborn screening specimen remainders from being used for non-newborn-related health studies without first obtaining parental informed consent. While the newborn screening statute permits use of newborn screening specimens for purposes related to that program, it does not provide for the specimen remainders to be used for purposes outside the newborn screening program. As such, any use of the specimens for purposes not related to the newborn screening program is subject to the written informed consent requirements of the genetic privacy act.

Nevertheless, we conclude that appellants' claims related to use of the blood

---

6.   The district court also ruled that because newborn screening is conducted on biological samples, not genetic information, the genetic privacy act does not apply. This conclusion does not find support in the genetic privacy act definitions, which include "biological information" in the definition of "genetic infor-

mation." *See* Minn.Stat. § 13.386, subd. 1(2)(b) (defining "genetic information" to include "medical or biological information collected from an individual about a particular genetic condition that is or might be used to provide medical care to that individual").

specimens outside of the newborn screening program fail for several reasons. First, only nine of the 25 appellant-children were born after the genetic privacy act became effective, and the genetic privacy act applies only "to genetic information collected on or after that date." 2006 Minn. Laws ch. 253, § 4. *See* Minn.Stat. § 645.21 (2008) (stating that "[n]o law shall be construed to be retroactive unless clearly and manifestly so intended by the legislature"). Second, respondents have offered specific evidence that the blood screening results of all 25 children involved in this action were not used in any public-health studies or research, and appellants have not countered this offer of evidence. Thus, appellants have failed to either "present specific facts showing there is a genuine issue for trial," Minn. R. Civ. P. 56.05, or to offer "substantial evidence" to support their genetic privacy act claim, or their other claims for tort, violation of privacy, or governmental taking. *See Osborne v. Twin Town Bowl, Inc.,* 749 N.W.2d 367, 371 (Minn.2008) ("mere speculation, without some concrete evidence, is not enough to avoid summary judgment") (quotation omitted); *Nicollet Restoration, Inc. v. City of St. Paul,* 533 N.W.2d 845,

848 (Minn.1995) (stating that while causation is usually a jury issue, general assertions of substantial evidence are insufficient to create a genuine issue of material fact for trial); *Murphy,* 307 Minn. at 351, 240 N.W.2d at 512 (stating material fact issue must be established by "substantial evidence").[7] For these reasons, we conclude that the district court did not err by granting summary judgment on any of appellants' claims for alleged conduct that was not authorized by the newborn screening statute.[8]

Finally, we note that, while both appellants and respondents attempt to draw this court into peripheral matters both legislative and administrative, we will review only the matter before us. Any administrative proceedings pertaining to proposed rule changes for the newborn screening process or legislative proceedings that have not resulted in changes to the statutes are not the subject of this appeal and have no legal import here because they do not bear on our interpretations of the statutes at issue. *See* Minn.Stat. § 645.16(8) (2008) (providing that legislative intent may be ascertained by reference to "legislative and administrative interpretations of

7. Because respondents were authorized by the newborn screening statute to collect, retain, and use the subject children's blood during the newborn screening process and because appellants have failed to offer evidence to show that respondents violated the genetic privacy act by their conduct for any retention or use of the specimen remainders outside of the newborn screening program, appellants are unable to establish an injury in fact for purposes of initiating any of their alleged tort claims. *See State v. Philip Morris Inc.,* 551 N.W.2d 490, 493 (Minn.1996) (stating that "[t]he requirements of a tort claim" include "that the plaintiff did in fact suffer injury"). As to appellants' constitutional claims, they also fail because the alleged facts show that any governmental "taking" or "invasion of privacy" was permitted by the newborn screening statute, and appellants have not

challenged the legality of that statute. *See Bennis v. Michigan,* 516 U.S. 442, 452, 116 S.Ct. 994, 1001, 134 L.Ed.2d 68 (1996) (stating that government has no duty to "compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority"); *Schmerber v. State of California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966) (stating that the purpose of constitutional privacy protection is "to protect personal privacy and dignity against *unwarranted* intrusion") (emphasis added).

8. We note that if appellants are concerned that the commissioner might use their screening samples outside the screening program in the future they can still request that their blood samples and test results be destroyed.

the statute" only "[w]hen the words of a law are not explicit"); *In re Welfare of J.B.*, 782 N.W.2d 535, 548 n. 8 (Minn. May 14, 2010) (stating that when a "statute is phrased in common terms, we have declined to defer to administrative expertise").

## DECISION

Because respondents were expressly authorized by the newborn screening statute to collect, retain, use, and disseminate the subject children's blood as part of the newborn screening process and because appellants have failed to show that their screening specimens were used for other, non-screening purposes that would trigger the informed consent requirements of the genetic privacy act, the district court properly granted summary judgment to respondents.

**Affirmed.**